UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

O.K., et al.,

     Petitioners,

         v.

GEORGE W. BUSH, et al.,

     Respondents.

Civil Action No.  04-1136 (JDB)

## MEMORANDUM OPINION

The petitioner in this habeas action is an eighteen-year old detainee at the United States

Naval Base in Guantánamo Bay, Cuba, who has been held in United States custody since the age

of fifteen.  This action comes before the Court on his dual motions for a preliminary injunction

barring the respondents from subjecting him to torture or interrogation and a preliminary

injunction ordering the government to provide his counsel and the Court with thirty days' notice

prior to transferring him out of Guantánamo to a foreign country.  The first motion reflects the

opening of a new front in the ongoing litigation over the legal rights of the detainees at

Guantánamo, while the second motion seeks to introduce new arguments in favor of a form of

relief that this Court already denied with regard to a different Guantánamo detainee several weeks

ago.

     For the reasons set out below, the Court denies both of the motions.

## BACKGROUND

     Petitioner O.K. ("petitioner") is a citizen of Canada who was taken into United States

custody in Afghanistan following a gun fight in which at least one American soldier was killed. He was fifteen years old at the time of his capture in July 2002.[1]  He was detained for a period at a military base in Bagram, Afghanistan, following his capture, and was then transferred in October 2002 to the United States Naval Base in Guantánamo Bay, Cuba, where he has been held to this day.  This action began on July 2, 2004, when petitioner filed a petition for a writ of habeas corpus -- through his grandmother as next friend -- challenging the fact of his detention and the conditions of his confinement in United States custody.[2]  The petition states claims under the United States Constitution, several federal statutes and regulations, and international law.

Shortly after commencing this action, petitioners filed a motion seeking an emergency order requiring the respondents to release his medical records and permit an outside doctor to perform an independent medical evaluation of him at Guantánamo.  The motion was premised on the theory that an assessment of petitioner's mental health was necessary to determine his competency to participate in the litigation of his habeas claims.  The Court denied that motion in a memorandum opinion and order dated October 26, 2004, explaining that an individual does not enjoy a right to a determination of his mental competence to bring a habeas action, and even if there existed such a right, petitioners had failed to submit competent evidence calling into question petitioner's competence to assist in the litigation of the habeas claims in this case.  See O.K. v. Bush, 344 F. Supp. 2d 44, 54-60 (D.D.C. 2004).

Meanwhile, on August 17, 2004, the Calendar and Case Management Committee of the

---

[1]  Because petitioner was a minor when the habeas petition in this case was filed, the Court uses his initials, consistent with the rules of this Court and the practice of the parties throughout this litigation.  See L.Civ.R. 5.4(f)(2).

[2]  Petitioner and his grandmother together will be referred to as "petitioners."

Court issued an order instructing the judges presiding over Guantánamo petitions to transfer those petitions to Senior Judge Joyce Hens Green for the limited purpose of coordination and management.  On September 15, 2004, the Executive Session of the Court issued a Resolution also authorizing Judge Green to address substantive issues common to the Guantánamo cases upon the consent of the transferring judge.  The respondents filed motions to dismiss in this case and the other twelve Guantánamo cases pending at that time.[3]  On November 10, 2005, this judge transferred the motion to dismiss in this case to Judge Green for decision.  The judges presiding over ten of the other twelve Guantánamo cases also transferred the motions to dismiss in their cases to Judge Green.  Judge Richard Leon elected to retain the motions to dismiss in his two cases.

On January 31, 2005, Judge Green issued a memorandum opinion and order in this case and the other transferred cases denying in part and granting in part the respondents' motions to dismiss.  The opinion concludes in principal part that the petitioners at Guantánamo are vested with the right not to be deprived of liberty without due process of law under the Fifth Amendment to the United States Constitution, and that the composition and the procedures of the Combatant Status Review Tribunals tasked with assessing whether the petitioners were properly held at Guantánamo as enemy combatants infringed that right.  See In re Guantánamo Detainee Cases, 355 F. Supp. 2d 443, 454-64, 468-78 (D.D.C. 2005).  Judge Green also held that those petitioners who were determined by the Combatant Status Review Tribunals to be Taliban fighters potentially could maintain certain claims under the Geneva Convention as well.  See id. at 478-80.  In most

---

[3]  The thirteen actions involved the petitions of more than sixty detainees.  See In re Guantánamo Detainee Cases, 355 F. Supp. 2d 443, 451 (D.D.C. 2005).

other respects, Judge Green dismissed the petitioners' claims.  See id. at 480-81.  Judge Green's

decision departed in significant respects from the decision of Judge Leon two weeks earlier

granting the respondents' motions to dismiss in full in the two cases pending before him.

See Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005).

      In an order accompanying the January 31, 2005 memorandum opinion, Judge Green asked

the parties to brief the question of how the cases should proceed in light of her decision.  On

February 3, 2005, the respondents filed a motion seeking certification of the decision for an

interlocutory appeal, and requesting a stay of the proceedings in the transferred cases pending the

appeal.  The petitioners filed papers the same day urging Judge Green to allow the cases to

continue forward without a stay of any kind.  They explained that further proceedings were

necessary not only to develop the record on issues relating to the legality of the petitioners'

detention, but also to allow the Court to consider the petitioners' "forthcoming motion" on the

conditions of their confinement at Guantánamo.  Pet'rs' Joint Submission at 2-4, Feb. 3, 2005.

Judge Green issued an order later the same day certifying her decision for interlocutory appeal and

staying the proceedings in the transferred cases "for all purposes pending resolution of all appeals

in this matter."  Order of Feb. 3, 2005 at 1.

      The petitioners then filed additional papers asking Judge Green to modify the stay "to

allow Petitioners to pursue factual development regarding claims of torture and severe

mistreatment."  On February 8, 2005, Judge Green denied this motion, citing "the substantial

resources that would be expended and the significant burdens that would be incurred should this

litigation go forward" when reversal of her January 31, 2005 decision on appeal would render the

further proceedings moot.  Order of Feb. 8, 2005, at 1.  During the next several weeks, the

-4-

respondents and petitioners would take appeals from Judge Green's decision denying in part and granting in part the motions to dismiss in the transferred cases, and the petitioners would take appeals from Judge Leon's decision granting motions to dismiss in his cases.  Those appeals are now pending before the United States Court of Appeals for the District of Columbia Circuit.

Meanwhile, at the same time that Judges Green and Leon were adjudicating the motions to dismiss in their thirteen cases, dozens of new habeas petitions were being filed in this federal court on behalf of Guantánamo detainees.  Starting in March 2005, a number of the petitioners in these new cases, along with several of the petitioners in the first group of thirteen cases, began filing emergency motions seeking a new form of relief:  a preliminary injunction requiring the respondents to provide thirty days' notice to petitioners' counsel and the Court prior to transferring the petitioners out of Guantánamo to foreign countries.  Most of the judges of this Court have granted the request, but others have not.  Compare Kurnaz v. Bush, No. 04-1135, 2005 WL 839542, at *3 (D.D.C. Apr. 12, 2005) (requiring respondents to provide thirty days' notice prior to any transfer where "respondents do not have an understanding with the receiving country that a transfer . . . is for purposes of release only"), and Al-Marri v. Bush, No. 04-2035, 2005 WL 774843, at *6 (D.D.C. Apr. 4, 2005) (ordering respondents to provide"30 days' notice of any transfer from GTMO"), with Almurbati v. Bush, No. 04-1227, 366 F. Supp. 2d 72, 82 (D.D.C. 2005) (denying motion for thirty days' notice but requiring respondents to submit a declaration advising the Court of any transfers and "certifying that any such transfers . . . were not made for the purpose of merely continuing the petitioners' detention on behalf of the United States or for the purpose of extinguishing this Court's jurisdiction over the petitioners' actions for habeas relief").

On April 21, 2005, in a habeas petition brought on behalf of several Saudi Arabian citizens detained at Guantánamo and filed after Judges Green and Leon issued their decisions, this judge denied the motion for thirty days' notice prior to transfer.  See Al-Anazi v. Bush, 370 F. Supp. 2d 188, 190 (D.D.C. 2005).  This Court based its decision in part on the absence of any competent evidence that the respondents were transferring detainees out of Guantánamo for continuing United States custody on foreign soil, either to procure their torture outside of the jurisdiction of this Court through a foreign intermediary or for any other improper motive.  See id. at 195-96. The Court also relied on sworn and unrebutted declarations from high-level government officials confirming that the United States was not transferring detainees to foreign soil for ongoing United States custody, and the pledge of the respondents at a hearing that respondents would notify the Court were this practice to change.  (A more detailed discussion of this Court's earlier decision in Al-Anazi can be found in the Analysis section below.)

Petitioners in this action have filed two separate motions for preliminary injunctions that are now pending before this Court.  The first motion, filed on March 21, 2005, seeks an order preventing the "interrogation, torture and other cruel, inhuman, or degrading treatment of petitioner."  The motion explains that when counsel for petitioner met with him for the first time in November 2004, petitioner reported several instances of alleged mistreatment at the hands of interrogators and military personnel at both the military base in Afghanistan and at Guantánamo. See Decl. of Muneer I. Ahmad ("Ahmad Decl."), March 21, 2005, Ex. 1.  Following the meeting, petitioner wrote a letter to counsel -- dated January 13, 2005 and received by counsel on February 7, 2005 -- that described additional allegations of misconduct, and prompted a second visit from counsel on April 25, 2005 at which petitioner voiced further concerns about his treatment.

The allegations of mistreatment can be divided into three separate time periods.[4]  The first period consists of incidents that are alleged to have occurred while petitioner was still being held in Bagram, Afghanistan, in the summer of 2002.  Petitioner claims that while he was recovering from bullet wounds he sustained during his capture, interrogators threw cold water at him, forced him to carry heavy buckets of water, and made him stand with his hands tied above a door frame for hours at a time.  Petitioner also alleges that he was interrogated at his bedside in the period immediately following his capture, and was refused pain medication on occasion.  Finally, petitioner describes incidents in United States custody in Afghanistan where he was interrogated with a bag over his head in a room with barking dogs, was forced to urinate on himself during interrogations, and was ordered to pick up trash and place it in a trash bag, only to have an interrogator empty the trash bag and force him to collect the trash once again.  See Ahmad Decl., Ex. 1, ¶¶ 16-17.

The second set of allegations comprise the first year of petitioner's detention at Guantánamo (from October 2002 to October 2003).  Petitioner claims that when he first arrived at Guantánamo he heard a military official say "Welcome to Israel."  Several months later, in March 2003, petitioner contends that he was removed from his cell in the middle of the night and brought to an interrogation room, where he was "short shackled" such that his wrists and ankles were handcuffed together and the handcuffs were bolted to the floor.  He alleges that military police then forced him into stress positions for periods of hours.  One of the positions required him to lie

---

[4]  The allegations are submitted to the Court in memoranda attached to the sworn declaration of one of petitioners' counsel, and in an unsworn declaration of another of petitioners' counsel.  See Ahmad Decl., Mar. 21, 2005, Exs. 1 & 2; Decl. of Richard Wilson ("Wilson Decl."), Apr. 25, 2005.

on his stomach with his hands and feet cuffed together behind his back.  He was not allowed to use the bathroom while in the stress positions, and eventually urinated on the floor and himself.  Petitioner alleges that military police then poured pine oil on the floor and on petitioner, and with petitioner still short shackled, used petitioner as a "human mop," dragging petitioner back and forth through the mixture of urine and pine oil on the floor.  See Ahmad Decl., Ex. 1, ¶¶ 15, 18.

During this same period, petitioner claims that an interrogator displeased with his answers spat in his face, pulled his hair, and threatened to send him to Egypt, Israel, Jordan, or Syria if he did not cooperate.  See id. ¶ 12.  According to petitioner, the interrogator also told him that if he were sent to Egypt, the Egyptian authorities would send in "Askri raqm tisa" -- which is Arabic for "Soldier Number 9" -- and that this was a man who would be sent to rape him.  The interrogator is then alleged to have shackled petitioner's hands and ankles and forced petitioner to sit down on the floor and then stand up many times in succession.  Petitioner reports that he found this difficult because of the way he was shackled, and when he finally refused to stand again, the interrogator called two military police officers into the room, who grabbed petitioner, lifted him up, and then dropped him to the floor.  He alleges that they repeated this sequence several times at the instruction of the interrogator.  See id. ¶¶ 12-13.

Petitioner alleges that several months later, in September 2003, he was interrogated by two individuals claiming to be from Canada.  He says that following the interrogation, his security level was changed from Level 1 to Level 4 minus, everything was taken from him, and he spent a month in isolation.  He claims that the room in which he was confined was kept so cold that it felt like a refrigerator.  See id. ¶ 9.  In October 2003, he says he was interrogated by a man claiming to be a representative of the Afghan government.  The interrogator grew dissatisfied with petitioner's

statements and short-shackled his hands and feet to a bolt in the floor, moved his hands behind his knees, and maintained him in that position for hours.  At one point, the interrogator allegedly told petitioner that a new detention center was being built in Afghanistan for uncooperative detainees.  The interrogator threatened to send petitioner to Afghanistan, and told petitioner that they like small boys there, a comment that petitioner says he understood to be a threat of sexual violence.  Petitioner alleges that the interrogator then took a piece of paper and wrote on it, "This detainee must be transferred to Bagram," and left the room.  See id. ¶¶ 10-11.

   The final set of allegations concerns the period from November 2004 to the present day.  Petitioner claims that he was interrogated in November 2004 after his visit with his counsel, and that an interrogator asked about the visit.  See id. ¶ 2.  Petitioner claims that he was interrogated again for four consecutive days from December 7 to December 10, 2004.  He maintains that during the first day of questioning, interrogators threatened to strip him to his undershorts if he did not confess to certain terrorist acts, and during the second day, he was forced to sit on an extremely cold floor and was not allowed to perform his prayers.  He alleges that he was subjected to extremely cold temperatures in his cell during this period, and that guards have refused to change the temperature when asked.  Petitioner also reports that he was recently pushed to the floor and held face-down when he complained to guards during his exercise period, and that he has been questioned by psychologists who he believes are sharing information with his interrogators.[5]

---

   [5] Petitioner adds that Emergency or Initial Response Forces have pacified detainees who responded violently during interrogations, although he admits that no such force has been used against him, because he has never violently resisted instructions given to him by an interrogator or official.  Wilson Decl. ¶¶ 15-16.

Petitioners maintain that many of these allegations are consistent with the reports of federal officials who have visited Guantánamo.  For example, petitioners cite correspondence released to the American Civil Liberties Union under the Freedom of Information Act in which an agent of the Federal Bureau of Investigation ("FBI") provides an eye-witness account of the short-shackling of detainees in stress positions, the exposure of detainees to extreme cold temperatures, and the placement of detainees in situations where they are forced to urinate on themselves:

> On a couple of occasions, I entered interview rooms to find a detainee chained hand and foot in a fetal position to the floor, with no chair, food, or water.  Most times they had urinated or defecated on themselves, and had been left there for 18, 24 hours or more.  On one occasion, the air conditioning had been turned down so far and the temperature was so cold in the room, that the barefooted detainee was shaking with cold.  When I asked the MPs what was going on, I was told that interrogators from the day prior had ordered this treatment, and the detainee was not to be moved.  On another occasion, the A/C had been turned off, making the temperature in the unventilated room probably well over 100 degrees.  The detainee was almost unconscious on the floor, with a pile of hair next to him.  He had apparently been literally pulling his own hair out throughout the night.  On another occasion, not only was the temperature unbearably hot, but extremely loud rap music was being played in the room, and had been since the day before, with the detainee chained hand and foot in the fetal position on the tile floor.

Email from [redacted] to [redacted], Aug. 2, 2004, available at http://www.aclu.org/torturefoia/ released/fbi.121504.5053.pdf.

According to newspaper reports, former interrogators at Guantánamo recently "confirmed earlier accounts of inmates being shackled for hours and left to soil themselves while exposed to blaring music."  Neil A. Lewis, <u>Fresh Details Emerge on Harsh Methods at Guantánamo</u>, New York Times, Jan. 1, 2005, at A11.  News sources have also reported that a top Navy psychologist told a supervisor in December 2002 that interrogators were starting to use "abusive techniques"; the General Counsel of the Navy described the interrogation techniques at Guantánamo as "unlawful and unworthy of the military services"; and Navy officials considered removing Navy

interrogators from the operation at Guantánamo in 2002 because they were outraged at the level of abuse in interrogations. Charlie Savage, <u>Abuse Led Navy to Consider Pulling Cuba Interrogators</u>, Boston Globe, Mar. 16, 2005, at A1. Finally, petitioners cite newspaper articles relating the similar allegations of detainees who have since been released from Guantánamo. <u>See</u> Carol D. Leonnig & Glenn Frankel, <u>U.S. Will Transfer Five Guantánamo Prisoners</u>, Washington Post, Jan. 12, 2005, at A1 (describing detainee allegations of "frigid and stifling temperatures, short shackles and random beatings").

At the November 2004 meeting, petitioners' counsel elicited information from petitioner regarding his mental condition and administered a Folstein Mini Mental Status examination. After clearing the information with the Department of Justice,[6] counsel for petitioners provided it to Dr. Eric W. Trupin, a specialist in issues relating to the physical and mental abuse of juveniles. Dr. Trupin has submitted a declaration that concludes, on the basis of the material before him, that there is a "high probability" that petitioner "suffers from a significant mental disorder, including but not limited to post-traumatic stress disorder and depression" and that petitioner's "symptoms are consistent with those exhibited by victims of torture and abuse." Decl. of Eric W. Trupin, Ph.D., Mar. 17, 2005, ¶¶ 19-23. Counsel for petitioners also administered a Proxy Psychiatric Assessment during their second visit with petitioner in April 2005. They submitted the results to

---

[6] Petitioners' counsel report that they relinquished their notes to military officials upon leaving Guantánamo for the first time on November 10, 2004. They received the notes back in the mail on December 16, 2004, submitted a memorandum containing portions of the notes to the Compliance Review & Litigation Security Group at the Department of Justice on December 30, 2004, and received a determination on January 12, 2005 that more than half of the paragraphs in the memorandum were classified. Petitioners' counsel asked the Department of Justice to reconsider the classification determination, and were notified on January 28, 2005, that all of the paragraphs in the memorandum were determined on second review to be unclassified. Petitioners' counsel explain that they forwarded the notes to Dr. Trupin that same day. Ahmad Decl. ¶¶ 4-8.

a forensic psychologist, who concluded in a letter to counsel that petitioner's self-reporting

symptoms meet the "full criteria for a diagnosis of Post-Traumatic Stress Disorder."  Letter from

Dr. Daryl Matthews to Prof. Rick Wilson, Apr. 21, 2005.

On April 13, 2005, respondents filed a memorandum in opposition to petitioners' motion.

Attached to the memorandum were declarations from several government officials who are

involved in the detention and interrogation of persons at Guantánamo.  These include a

declaration from Colonel John A. Hadjis, the Chief of Staff for the Commander, Joint Task Force-

Guantánamo, stating that it is the policy of the officers at Guantánamo, consistent with the

President's directive to treat detainees humanely, not to permit the mistreatment or abuse of

detainees and to investigate any allegations of mistreatment at Guantánamo; a declaration from

Esteban Rodriguez, the Director of the Joint Intelligence Group at Guantánamo, who describes in

general terms the essential contribution that the interrogation of detainees at Guantánamo has

made to the nation's security; and a declaration from Captain John S. Edmondson, M.D., the

Commander of the U.S. Navy Hospital at Guantánamo, who describes the medical care available

to detainees at Guantánamo, details the particular medical care that has been provided to

petitioner, and states that the medical care of a detainee is not affected in any way by the

detainee's cooperation (or lack thereof) with interrogators.

Finally, respondents also submitted a declaration of a special agent with the Criminal

Investigation Task Force of the Department of Defense.  The declaration describes a series of

interrogations the special agent conducted with the petitioner at Guantánamo.  First, the special

agent discusses an interrogation in May 2004 in which the petitioner said that he was being well

treated by guards.  The special agent then provides an account of his interrogation of petitioner on

December 7 and 8, 2004 (dates that coincide with one of the interrogations that petitioner discusses in his motion).  The special agent describes the atmosphere of the interrogation as friendly and non-adversarial, and specifically refutes petitioner's allegations that he was threatened with being stripped to his undershorts or forced to sit on a cold floor at this interrogation.  Finally, the special agent states that he did not question petitioner about this litigation or petitioner's meeting with his lawyers, because he did not believe that these were a proper topic for examination.  See Decl. of [redacted], Apr. 11, 2005, ¶¶ 3-8.

Before filing the motion, counsel for petitioners informed respondents' counsel that they possessed information that petitioner had been mistreated, and asked respondents' counsel to consent to an end to interrogations of petitioner.  Counsel for respondents informed counsel for petitioners that they would forward a letter to the Department of Defense outlining the claims of abuse, but could take no further remedial action.  Respondents have since informed the Court that the United States Navy's Naval Criminal Investigative Service has commenced an investigation into petitioner's allegations of mistreatment.  See Mem. in Opp. to Pet'rs' Appl. for Prel. Inj. at 17.

On April 7, 2005, petitioners filed the second motion pending before the Court, this one seeking a preliminary injunction that would require respondents to provide thirty days' notice of an intent to remove petitioner from Guantánamo to another country.  The motion rests in large part on newspaper articles detailing reports of "rendition" by the Central Intelligence Agency of suspected terrorists (none of whom were detained at Guantánamo before they were rendered), and petitioner's claims -- described above -- that interrogators have threatened him with deportation to countries where he would be sexually assaulted.  Respondents submitted an opposition to this motion to which they attached declarations from high-level United States government officials

averring that the United States does not transfer individuals to countries where it is more likely

than not that they will be tortured.  The declarations proceed to explain that when the United

States transfers Guantánamo detainees to another country, the detainees are no longer subject to

the control of the United States, and any ongoing confinement in the receiving country is solely

the result of the law-enforcement interests of the receiving government based on its own

assessment and application of its domestic law.  See Decl. of Matthew C. Waxman, Mar. 8, 2005,

¶¶ 3-5; Second Decl. of Matthew C. Waxman, Mar. 16, 2005, ¶ 5; Decl. of Pierre-Richard

Prosper, Mar. 8, 2005, ¶ 4.  These are the same declarations that served as the basis for this

Court's ruling in Al-Anazi denying the request in that case for a period of thirty days' notice prior

to the transfer of detainees.[7]

_____

[7] On July 11, 2005, a day before this opinion was issued, respondents filed a new declaration of one of the government officials.  See Decl. of Matthew C. Waxman, June 2, 2005. The declaration states that it "replaces" the earlier declarations of the official in this case.  Id. ¶ 1; see also Notice of July 11, 2005, at 1 (new declaration serves "to update, consolidate, and supersede" the official's earlier declarations).

Upon a review of the new declaration, the Court finds that it does not depart from the earlier declarations in any way that is material to the issues in this opinion, except in three respects.  First, the new declaration omits a statement contained in an earlier declaration that "[n]o transfer of any current habeas petitioner in this or the other pending habeas cases brought by individual, named GTMO detainees, other than for release as a result of being determined by a CSRT to no longer be an enemy combatant, is currently scheduled and, in all events, any transfer of any such petitioner, including those for release, would be several weeks away."  Second Decl. of Matthew C. Waxman, Mar. 16, 2005, ¶ 5.  Second, the new declaration omits a statement contained in an earlier declaration that "[t]here is no plan being considered now, or that has been considered in the recent past, to effect an immediate transfer of large numbers of GTMO detainees out of GTMO, including to other countries."  Id. ¶ 4.  Third, the new declaration replaces a statement in an earlier declaration that "[n]or is there any plan to effect transfers of GTMO detainees in order to thwart the actual or putative jurisdiction of any court with respect to detainees" with the statement "[t]ransfers of detainees are and have been made in accordance with the policy and process outlined herein, rather than to thwart the actual or putative jurisdiction of any court."  Compare id. with Decl. of Matthew C. Waxman, June 2, 2005, ¶ 3.

A hearing was held on both of the pending motions on May 10, 2005.

## STANDARD OF REVIEW

To prevail on a motion for a preliminary injunction, petitioners must demonstrate (I) a substantial likelihood of success on the merits; (ii) that they will suffer irreparable harm absent the relief requested; (iii) that other interested parties will not be harmed if the requested relief is granted; and (iv) that the public interest supports granting the requested relief. Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004); Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001); Taylor v. Resolution Trust Corp., 56 F.3d 1497, 1505-06 (D.C. Cir. 1995); Washington Area Metro. Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977). In determining whether to grant urgent relief, a court must "balance the strengths of the requesting party's arguments in each of the four required areas." CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995). A clear showing of irreparable harm, however, is the sine qua non of preliminary injunctive relief. Experience Works, Inc. v. Chao, 267 F. Supp. 2d 93, 96 (D.D.C. 2003).

Because preliminary injunctions represent an exceptional form of judicial relief, courts should issue them sparingly. Sociedad Adonima Vina Santa Rita v. United States Dep't of the Treasury, 193 F. Supp. 2d 6, 13 (D.D.C. 2001); see Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir. 1969). As the D.C. Circuit recently emphasized, a "preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." Cobell, 391 F.3d at 258; see Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).

## ANALYSIS

**I.      Motion for a Preliminary Injunction Against the Use of Interrogation or Torture**

In his first motion, petitioners ask the Court to enjoin the use against him of interrogation, torture, and other cruel, inhuman, or degrading treatment.  The aspect of this motion that relates specifically to interrogations can be disposed of quickly.  Petitioners do not cite any law for the extraordinary notion that a court may forbid the interrogation of individuals captured in the course of ongoing military hostilities.  Even supposing that the Court has the constitutional authority to intrude so dramatically on the prerogative of the Executive in the performance of the war power, petitioners do not offer a plausible legal or evidentiary basis for the exercise of that authority in this case.

In fact, the legal claims that petitioners raise in their papers do not seem to bear any discernible relation to interrogations at all.  Petitioners do not explain how the mere fact of the interrogation of detainees could conceivably be a violation of the Due Process Clause or any other cognizable source of legal rights.  Petitioners do not assert a right to the presence of counsel during his interrogations under Miranda v. Arizona, 541 U.S. 77, 89 (1966), or identify any other limitation -- in the Constitution or otherwise -- on the manner in which interrogation of detainees is conducted.[8]  Perhaps most important, petitioners have no answer to the declaration of a high-

---

[8]  Of course, petitioners do bring a challenge to the alleged use of torture in the interrogations, an issue to which the Court will turn in a moment.  But it is telling that even the lone case on which petitioners rely in arguing for an injunction against the use of *torture* during interrogations rejected a request for a broader injunction against the *interrogations themselves*.  See Inmates of the Attica Corr. Facility v. Rockefeller, 453 F.2d 12, 24 (2d Cir. 1971) ("[P]laintiffs ask for an injunction against any interrogation of inmates unless it is conducted in the presence of the inmate's counsel or the inmate has first been advised by legal counsel.  Such an order, however, would go beyond what is necessary for the protection of the rights of the inmates here, since they have been advised of their right to legal counsel and have been offered the

level military intelligence official detailing the critical role that the interrogation of Guantánamo

detainees has played in the war on terror and the danger that an injunction against further

questioning of detainees could pose to our nation's security.  Petitioners' request for an injunction

against interrogation has no likelihood of success on the merits and would present a grave risk to

the public interest, and therefore will be denied.

     The request for an injunction against the torture or other cruel or degrading treatment of

petitioner demands closer scrutiny.  Petitioner alleges that he was subject to several instances of

harsh treatment during his initial detention in Afghanistan (being forced to perform manual labor

and stand in taxing positions while recovering from wounds); even more severe treatment in the

course of his first year of his detention at Guantánamo (short-shackling of petitioner in stress

positions for several hours, using petitioner as a "human mop" to clean up a mixture of urine and

pine solvent, multiple threats of deportation and rape, and exposure to cold temperatures); and

milder treatment in the last year and a half (sitting on a cold floor in an interrogation room, threats

of disrobement during interrogations, and further exposure to cold temperatures).  The question

for the Court is whether this series of allegations -- the most serious of which occurred more than

eighteen months ago -- warrants the exceptional remedy of a preliminary injunction respecting the

conduct of respondents in this setting.  The Court concludes that such relief is not warranted.

     In reaching that conclusion, the Court does not downplay the seriousness of petitioner's

allegations.  Judge Green held that petitioner is vested with rights arising out of the Due Process

---

services of numerous qualified lawyers, of which many inmates have availed themselves.").  That
case involved convicted felons being questioned about a prison riot, and thus there existed an even
greater role for judicial oversight of interrogations than in this case, where the court must also
account for the substantial deference due the Executive in carrying out its war and military
powers.

Clause of the Fifth Amendment.  That holding is the law of this particular case, and this Court will not revisit it here.  The analysis underlying that holding does not obviously distinguish between the procedural due process rights that were principally at issue in Judge Green's decision and the substantive due process right to be free from excessive force that petitioners wish to invoke here.[9]  And although the precise contours of that latter right would be shaped by the considerable deference owed the Executive in the domain of military affairs, and the unique issues raised by the interrogation of detainees in a war footing, it is at least conceivable that a detainee could allege facts so egregious that they would demand judicial review.[10]

The Court does not find it necessary to decide whether petitioner has a constitutional right to be free from torture, the exact location of the line that the Constitution would draw in this setting, or whether the petitioner's allegations in this case cross that line.  Even if petitioner were

---

[9]  That the right of an individual to be free from the use of excessive force is anchored in principles of substantive due process -- at least when it occurs other than during a criminal arrest or an investigatory stop -- has been affirmed on several occasions by the Supreme Court.  See County of Sacramento v. Lewis, 523 U.S. 833, 843-49 (1998); Graham v. Connor, 490 U.S. 386, 394 (1989).  Of course, petitioners are not arguing that petitioner is being denied the due process of law prior to being tortured.  Petitioners are arguing that it is unlawful for him to be tortured at all.

[10]  The Supreme Court has instructed that "the substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense."  Lewis, 523 U.S. at 846 (quotation omitted).  Conduct that "shocks in one environment may not be so patently egregious in another," however, and the "concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking."  Id. at 850-51; see also Hudson v. McMillian, 503 U.S. 1, 4 (1992) ("What is necessary to establish an 'unnecessary and wanton infliction of pain,' we said, varies according to the nature of the alleged constitutional violation.").  So, for instance, the Supreme Court has set a higher bar for excessive force claims arising out of riots or high-speed chases than in other settings.  See Lewis, 523 U.S. at 848.  No federal court has ever examined the nature of the substantive due process rights of a prisoner in a military interrogation or prisoner of war context.

able to demonstrate that he possesses a right to be free from torture and that certain of his allegations would constitute violations of that right, he has not come forward with the showing necessary to secure the forward-looking order he seeks.  There are fundamental limits on the breadth of a court's jurisdiction and the scope of its remedial powers.  One of those is the principle that a court will not issue prospective relief unless there is a concrete showing that a party is likely to face unlawful conduct in the imminent future.  Thus, a plaintiff seeking an injunction "cannot simply allege that he was previously subjected to the defendant's actions."  Dist. of Columbia Common Cause v. Dist. of Columbia, 858 F.2d 1, 8 (D.C. Cir. 1988).  She must also show that "there is a real and immediate threat of repeated injury" in the future.  Id.

Whether regarded as a prerequisite to a plaintiff's standing to seek injunctive relief, City of Los Angeles v. Lyons, 461 U.S. 95, 105, 110 (1982), or as a facet of the irreparable harm element of the preliminary injunction test, Comm. in Solidarity with the People of El Salvador v. Sessions, 929 F.2d 742, 745- 46 (D.C. Cir. 1991), the requirement that a plaintiff demonstrate a likelihood of injury in the imminent future in order to secure an injunction is a well-established rule of law.  See Lyons, 461 U.S. at 105, 110 (plaintiff seeking injunction against police abuse must show "real and immediate threat of again being illegally choked"); Does I through III  v. Dist. of Columbia, 216 F.R.D. 5, 9 (D.D.C. 2003) ("plaintiff must demonstrate, not only that she has been harmed in the past, but that she is realistically threatened by a repetition of the violation") (alteration and quotation omitted).  And if anything, the requirement takes on added importance in a case where the Court is asked to regulate the conduct of the Executive in the theater of war.  See D.L.S. v. Utah, 374 F.3d 971, 973 (10th Cir. 1994) (cases such as Lyons "preserve appropriate separation of powers between the courts and the other branches").

Petitioners have not satisfied this requirement.  As noted, the most serious of petitioner's allegations -- short-shackling in stress positions for extended periods, use of petitioner as a "human mop," abusive physical treatment by guards, and threats of sexual abuse -- date to October 2003.  Petitioner does not claim that these forms of mistreatment, or any others of a similar level of severity, have occurred since that date.  Petitioners also do not offer any reason to believe that this sort of misconduct is going to suddenly materialize again in the near future.  The news reports and government documents referenced in petitioners' papers do not shed any light on this question.  Quite simply, even accepting petitioners' allegations of past misconduct as true, the record is barren of evidence of a "real and immediate threat" that petitioner will be subjected in the foreseeable future to mistreatment similar to that which he alleges occurred in 2003.[11]  See Lyons, 461 U.S. at 110; Dist. of Columbia Common Cause, 858 F.2d at 8.  Petitioners' mere speculation that this will happen is not a competent basis for the exercise of the Court's equitable powers.[12]

That leaves the milder allegations of petitioner's interactions with officers in recent months. Several of these allegations -- such as the threats that petitioner would be stripped to his

---

[11]  The Court notes that petitioners' counsel themselves waited more than four months to file this motion even after they discovered the most serious allegations from petitioner, and the conduct apparently did not recur even during that period.  See Lyons, 461 U.S. at 107 ("We note that five months elapsed between October 6, 1976, and the filing of the complaint, yet there was no allegation of further unfortunate encounters between Lyons and the police.").

[12]  The fact that petitioner was a minor when many of the alleged incidents occurred does not change this analysis.  His status as a minor does not make the allegations of mistreatment any more likely to occur again in the future.  Moreover, as this Court noted in an earlier opinion in this case, "[w]hatever additional rights, if any, petitioner may have enjoyed when he was a juvenile, he is now an adult, and petitioners seek only prospective relief" in their motions for a preliminary injunction.  O.K., 344 F. Supp. 2d at 62.

underwear if he did not cooperate with interrogators, and that he was forced to sit on a cold floor in an interrogation room -- were denied by his interrogator in a sworn declaration.  None of these allegations -- including arguably the most serious during this period, which is the temperature in his cell being kept very low -- rise to the level of misconduct that would lead the Court to issue an injunction.  Absent a persuasive claim that the conditions of confinement at Guantánamo are so severe that they present an imminent threat to petitioner's health, the Court will not insert itself into the day-to-day operations of Guantánamo.

The ruling here is limited to the request for a preliminary injunction and the record in support of that request.  Past acts of cognizable mistreatment of petitioner or other detainees by the United States -- if proven -- should not be condoned by the federal courts.  But in assessing the need for extraordinary preliminary injunctive relief, the Court must examine whether such relief is warranted here because of a real, imminent threat of harm to petitioner in the future.  This Court is not equipped or authorized to assume the broader roles of a congressional oversight committee or a superintendent of the operations of a military base.  Indeed, to do so here could potentially open the gates to hundreds of detainee motions challenging every detail of the living conditions at Guantánamo at the very moment that the Court of Appeals is considering whether the detainees have any cognizable rights at all.

Recognizing these concerns, Judge Green issued a stay in this case (and many others) pending the appeal of her decision.  She entered the stay (and denied modification of it) over petitioners' repeated objection that a stay would prevent them from filing motions and developing evidence about their treatment at Guantánamo.  See supra at 4.  Based on those rulings, entered in this case, the Court is reluctant to act inconsistent with the stay absent compelling circumstances.

To be sure, the Court can lift that stay when the proper circumstances present themselves.  But the present setting, in which there is no showing of an irreparable and imminent danger to the rights of petitioner, is not such a circumstance.  For this reason, petitioners' motion must be denied.

## II.    Motion for Notice Prior to Transfer

In their second motion, petitioners seek a preliminary injunction that would force respondents to provide petitioners' counsel and the Court with thirty days' notice prior to any transfer of petitioner out of Guantánamo to a foreign state.  On April 21, 2005, this Court denied a similar motion filed by other petitioners.  See Al-Anazi v. Bush, 370 F. Supp. 2d 188 (D.D.C. 2005).  In that opinion, this Court explained that the petitioners there had failed to present persuasive evidence that the United States had transferred (or was planning to transfer) Guantánamo detainees to a foreign state in order to exercise continuing custody over the detainees on foreign soil, or secure their torture through the intermediary of a foreign government, or for any other impermissible purpose.  See id. at 194-95.  The Court noted that the very newspaper articles on which the petitioners relied in bringing their motion drew a careful distinction between reports of the "rendition" of terrorism suspects by the Central Intelligence Agency (where the receiving government was expected to carry out the will of the United States), and the transfer of Guantánamo detainees by the Department of Defense (where that was not the case).  See id. at 191, 196.

The Court also based its decision on sworn and unrebutted declarations from high-level Department of Defense and Department of State officials explaining that the United States did not transfer any Guantánamo detainee to a foreign state without first obtaining assurances from the receiving state that it was "more likely than not" that the detainee would be humanely treated upon

transfer (the legal standard set out in the regulations implementing the Convention Against

Torture).  The declarations also stated that the United States had declined to transfer certain

Guantánamo detainees due to unresolved concerns about the possibility that they would be

tortured by the receiving country.  See id. at 192.  The declarations further explained that the

Department of Defense does not ask receiving governments to detain a Guantánamo detainee on

behalf of the United States on foreign soil, and that there was no plan in place to effect transfers of

detainees to thwart the jurisdiction of any court.  See id. at 190-91, 195-96.[13]  Finally, the

respondents pledged to inform the Court if the United States ever were to begin to transfer

detainees overseas for continuing United States custody.  See id. at 196-97.  Petitioners offered

little in response to the declarations other than their own suspicions regarding the United States'

intentions at Guantánamo.  The Court declined to issue an order that would interfere with the

President's diplomatic relations and the movement of detainees in a time of ongoing hostilities on

the basis of the petitioners' simple mistrust of the government, and hence denied the motion.

Petitioners now ask the Court to reach a different result in this case, relying on two

considerations that they believe distinguish this case from Al-Anazi.  First, they observe that this

---

[13]  As noted in the background section, respondents filed in this case a more recent declaration of one of the officials that "replaces" prior declarations that respondents had earlier filed in this case, and that served as part of the basis for this Court's decision in Al-Anazi.  Decl. of Matthew C. Waxman, June 2, 2005, ¶ 1; see supra note 7.  After a careful review of the new declaration, the Court concludes that it does not alter the conclusions this Court reached in Al-Anazi.  Although the new declaration omits certain statements that were contained in the earlier declarations, it continues to state unequivocally that once a detainee is transferred from Guantánamo, the detainee "is no longer in the custody and control of the United States," and that the United States does not transfer detainees out of Guantánamo "to thwart the actual or putative jurisdiction of any court."  Id. ¶¶ 2, 5.  The Court continues to regard the respondents as bound to the pledge the Court understood them to make at a hearing in Al-Anazi that they will inform the Court if these policies change and they begin transferring Guantánamo detainees overseas for ongoing United States custody.

case (unlike Al-Anazi) was one of the habeas petitions that was transferred to Judge Green for a

consolidated decision on the respondents' motion to dismiss.  Her decision on the motion to

dismiss is currently pending on appeal before the D.C. Circuit.  Therefore, petitioners argue, this

case implicates Federal Rule of Appellate Procedure 23(a), which provides:

> Transfer of Custody Pending Review.  Pending review of a decision in a habeas
> corpus proceeding commenced before a court, justice, or judge of the United States
> for the release of a prisoner, the person having custody of the prisoner must not
> transfer custody to another unless a transfer is directed in accordance with this rule.
> When, upon application, a custodian shows the need for a transfer, the court,
> justice, or judge rendering the decision under review may authorize the transfer and
> substitute the successor custodian as a party.

Fed. R. App. P. 23(a).

As its text indicates, the concern of Rule 23(a) is one of technical compliance with the rule

that "there is generally only one proper respondent" to a habeas petition:  "the person with the

ability to produce the prisoner's body before the habeas court."  Rumsfeld v. Padilla, 124 S. Ct.

2711, 2717 (2004) (quotation omitted).  Rule 23(a) requires a district court to monitor compliance

with this rule even where the case is otherwise before the appellate court, to ensure that the courts

remain in a position to order the respondent to produce and release the petitioner if a ruling of the

appellate court -- or a later ruling of the district court -- so requires.  Id.; see Wood v. United

States, 873 F. Supp. 56, 56 (W.D. Mich. 1995) ("Rule 23(a) is designed to prevent frustration of

an appeal through transfer of the custody of the prisoner while the appeal is pending.  This

purpose is reflected in the provisions of the rule for substituting the successor custodian as a

party.").

Nothing in the Rule indicates a desire to extend it to situations where the United States (or

a state) is transferring an individual out of federal or state custody entirely.  Petitioners seize on

the word "another", but at a minimum, there is ambiguity as to whether that word is meant to refer to "another custodian who is a federal or state official" or "another custodian even if no court in the United States retains jurisdiction over the custodian."  The latter interpretation immediately runs into difficulty in the next sentence of the Rule:  if the prisoner is released from federal or state custody in such a situation, there will be no successor custodian to substitute, and therefore a court cannot "authorize the transfer and substitute the successor custodian as a party" upon a showing of need.  Fed. R. App. P. 23(a).[14]

Whatever might be said for an interpretation of the Rule that encompasses the transfer of a prisoner out of federal or state custody, it is implausible that Congress intended the Rule to block the movement of detainees captured in the course of ongoing military hostilities.  The Court has been pointed to no evidence on the face of the statute or elsewhere that indicates that such a use of the Rule was even within the contemplation of Congress, much less that it was Congress's intent. The interpretation of the Rule must therefore be guided by the well-settled canon of statutory interpretation providing that a court should not construe a statute to interfere with the province of the Executive over military affairs in the absence of a clear manifestation of Congressional intent to do so.  See Dep't of Navy v. Egan, 484 U.S. 518, 527 (1988) ("Unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."); William N. Eskridge, Jr. & Philip P. Frickey, Forward: Law as Equilibrium, 108 Harv. L. Rev. 26, 100 (1994) (collecting cases that recognize a

---

[14]  Because there is no comparable provision in the Federal Rules of Civil Procedure, this interpretation would also lead to the curious result that the United States may transfer an individual out of its custody at any point in a case except for the brief period when the case is on appeal.

"[s]uper-strong rule against congressional interference with [the] President's authority over foreign affairs and national security").

This case practically calls out for the application of this canon.  Petitioners' reading of Rule 23(a) would transform a technical and procedural rule that addresses the identity of the parties in a habeas proceeding into a sweeping prohibition on the transfer and release of military detainees while a case is on appeal.[15]  If the military affairs canon is to mean anything, it is that the Court cannot accomplish this transformation without clear evidence that the resulting limitations on the Executive's war powers reflect the will of Congress.  There is no such evidence in this case. Congress has the constitutional authority to "make Rules concerning Captures on Land and Water," and were it to enact a statute within the proper bounds of its authority, it would be the role of the Court to faithfully apply those laws as written.  U.S. Const. art. I, § 8.  It is not for the Court to write the rules of war in the interim, either by its own pen or through an overly generous interpretation of existing statutes.[16]

The other basis suggested by petitioners for distinguishing Al-Anazi is the presence in this

---

[15]  Note that this prohibition would not be confined to Guantánamo detainees, applying instead to any individual captured in military hostilities who has filed a habeas claim in federal court and then taken that case on appeal.

[16]  The Court notes that two of the petitioners in Rasul v. Bush were released from United States custody (apparently without the prior authorization of any court) after the Supreme Court granted certiorari in that case.  The Supreme Court mentioned the release of these petitioners in a footnote in Rasul without suggesting that it posed any problems under the counterpart to Rule 23(a) in the Supreme Court rules.  See Rasul, 124 S. Ct. 2686, 2690 n.1 (2004); Sup. Ct. Rule 36(1)-(2) ("Pending review in this Court of a decision in a habeas corpus proceeding commenced before a court, Justice, or judge of the United States, the person having custody of the prisoner may not transfer custody to another person unless the transfer is authorized under this Rule.  Upon application by a custodian, the court, Justice, or judge who entered the decision under review may authorize transfer and the substitution of a successor custodian as a party.").

case of allegations that interrogators threatened petitioner on more than one occasion with transfer to a third country where he would be sexually assaulted.  The question whether threats of this sort in a military interrogation setting amount to torture or otherwise violate any of the detainee's rights must be set to one side.  The issue here is whether the allegation of such threats amount to sufficient evidence of an actual transfer in the imminent future to warrant a different result in this case than the one reached in Al-Anazi.  As to this question, the Court notes once again the declarations in the record from high-level officials in the Department of Defense and Department of State that it is not the policy or practice of the United States to transfer detainees for the purpose of torture or any other improper reason.  It is this policy and practice that is relevant to whether there is a basis for the Court to issue an order providing thirty days' notice of a transfer, not what an interrogator may have told a detainee in an attempt to induce him to divulge information.  Petitioners do not cite any evidence that the interrogators have taken steps to carry out their threat to transfer the petitioner, or that a transfer of petitioner is otherwise imminent.  Petitioners also do not cite any facts that rebut the officials' sworn declarations in this case.  Thus, the Court rejects this attempt to distinguish the instant case from Al-Anazi, and denies petitioners' motion for notice prior to transfer.[17]

---

[17]  At oral argument, counsel for petitioners argued by analogy to cases in which courts have inquired into an individual's claims that it is more likely than not that he will be tortured if he is removed from the United States for immigration violations.  These cases are brought under section 2242(a) of the Foreign Affairs Reform and Restructuring Act of 1988 ("FARRA"), which implements Article 3 of the United Nations Convention Against Torture.  See 8 U.S.C. § 1231.  But as this Court explained in Al-Anazi, FARRA is expressly limited to claims arising out of a final order of removal.  See Al-Anazi, 2005 WL 1119602, at *5; see also Cornejo-Barreto v. Siefert, 379 F.3d 1075, 1086 (9th Cir. 2004) ("While § 2242(d) plainly contemplates judicial review of final orders of removal for compliance with the Torture Convention and the FARR Act, it just as plainly does not contemplate judicial review for anything else.").  Although the Executive is free to honor the instructions of FARRA outside of the removal context if it wishes,

## <u>CONCLUSION</u>

For the reasons set out above, petitioners' motions for a preliminary injunction blocking the interrogation or torture of petitioner, and for a preliminary injunction for thirty days' notice prior to transfer, are DENIED.  A separate order will issue herewith.


          /s/ John D. Bates
          JOHN D. BATES
          United States District Judge

Dated:   July 12, 2005

---

and there is at least some indication that the Executive has sought to adhere to the FARRA regulations and their "more likely than not" standard in the case of the Guantánamo detainees, FARRA is quite explicit that no legal rights can be derived from its rules outside of the removal setting, by analogy or otherwise.

Copies to:

Mainer I. Ahmad
Richard J. Wilson
American University Washington College of Law
4801 Massachusetts Avenue, NW
Washington, DC 20016
(202) 274-4140
Fax: (202) 274-0659
Email: mahmad@wcl.american.edu
Email: rwilson@wcl.american.edu
        *Counsel for petitioners*

Terry Marcus Henry
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20001
(202) 616-8298
(202) 514-4107
Fax: (202) 616-8460
Email: terry.henry@usdoj.gov
        *Counsel for respondents*